1 | NEWPORT TRIAL GROUP
A Professional Corporation
2 | Scott J. Ferrell, Bar No. 202091
sferrell@trialnewport.com
3 | James B. Hardin, Bar No. 205071
jhardin@trialnewport.com
4 | Steven R. Telles, Bar No. 246514
stelles@trialnewport.com
5 | 895 Dove Street, Suite 425
Newport Beach, CA  92660
6 | Tel: (949) 706-6464
Fax: (949) 706-6469

*Attorneys for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| ALISA NEAL, individually, and on behalf of all others similarly situated, | Case No. EDCV 12-531 DOC (OPx) |
|---|---|
| Plaintiff, | **DECLARATION OF DR. LYNN R. WILLIS IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| vs. | |
| NATURALCARE, INC., a corporation; and DOES 1-25, Inclusive, | [*Filed and served concurrently with Motion for Class Certification, Declarations of Scott J. Ferrell, Andrew Baslow and Alisa Neal, and Proposed Order*] |
| Defendants. | Date:  August 6, 2012<br>Time:  8:30am<br>Crtrm:  9D |

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

I, Dr. Lynn R. Willis, hereby declare as follows:

My name is Dr. Lynn R. Willis. I am a fully competent adult. I have personal knowledge of the facts set forth herein, and if called upon to testify thereto, I could and would competently do so under oath.

## I.   QUALIFICATIONS

1. A true and correct copy of my *curriculum vitae*, attached hereto as Exhibit A, outlines my background, education, research, academic distinctions, research and publications. As set forth in my *curriculum vitae*:

2. I attended San Diego State University from 1959-1962 and then transferred to Oregon State University where I received B.S. degrees in General Science (1965) and Pharmacy (1966).

3. I received my Ph.D. in Pharmacology from the University of Iowa in 1970.

4. After receiving my Ph.D., I served as an NIH Postdoctoral Research Fellow in the Department of Physiology at the Mayo Clinic in Rochester, Minnesota from 1971-73.

5. I was an Instructor in Physiology at the Mayo School of Medicine at the Mayo Clinic in Rochester, Minnesota from 1972-73.

6. I was an Assistant Professor at the Department of Pharmacology and Toxicology at the Indiana University School of Medicine in Indianapolis, Indiana from 1977-82.

7. I was an Associate Professor at the Department of Pharmacology and Toxicology at the Indiana University School of Medicine in Indianapolis, Indiana from 1977-82.

8. I was a Professor at the Department of Pharmacology and Toxicology at the Indiana University School of Medicine in Indianapolis, Indiana from 1982-2006, whereupon I retired.

9. I am now a Professor Emeritus at the Department of Pharmacology and Toxicology at the Indiana University School of Medicine in Indianapolis, Indiana and have been since my retirement from the University in 2006.

10. I spent my 33-year career at Indiana University conducting basic renal research and teaching in the Medical, Dental, Nursing, and Graduate Schools.

11. I taught the basic principles of pharmacology to medical, dental, and nursing students. These principles are taught at all such professional schools, but for the medical pharmacology course at Indiana University, which I directed for 23 years, I incorporated additional instruction into the course on critical thinking, over-the-counter medications, herbal medicines, dietary supplements, alternative medicine, and homeopathy. At that time, these subjects were being taught only in some U.S. medical schools.

12. The bulk of my teaching effort in the professional schools at Indiana University was devoted to the medical pharmacology course. Over the years, I lectured on nearly every subject covered in the course and received numerous awards for excellence in teaching.

13. I trained graduate students and post-doctoral fellows in my laboratory and taught them how to conduct research (formulate testable hypotheses, design experiments, analyze and interpret their data), perform necessary surgical procedures in experimental animals, present their findings at professional meetings, and publish their data.

14. In the Graduate School, over the years, I taught or participated in several courses on advanced aspects of pharmacology, toxicology, and the conduct of research.

15. One such course, which I designed, and which is particularly germane to the task at hand, presented the basic elements of experimental design, data analysis and interpretation, and critical thinking in such a way as to prepare graduate students to evaluate and interpret the scientific literature with objectivity and precision.

16. My research at Indiana University was sufficiently well funded by extra- and intramural grants to have been nearly continuous throughout my tenure. I have published nearly 90 scientific publications in peer-reviewed journals, as well as several chapters in textbooks and monographs.

17. I was recognized for my research in shock wave lithotripsy (kidney stone disease) in 2002 by receiving the Yamanouchi Award from the American Urological Association.

18. I am a member of several professional organizations; in particular, the American Society for Pharmacology and Experimental Therapeutics, the American Society of Nephrology, the American Society for Experimental Biology and Medicine, the Council for High Blood Pressure Research of the American Heart Association, and the National Council against Health Fraud.

19. Between 1985 and 1990 I wrote weekly newspaper columns ("Over-The-Counter Drugs," and "The Right Remedy") for the San Francisco Chronicle and the Indianapolis News, and published invited articles on nonprescription drugs in the Seattle Times, the Washington Post, and Healthline Magazine.

## II. BASIS FOR OPINIONS

20. My conclusions and analyses are reached by thorough scientific inquiry and research. Indeed, my opinions as expressed herein rest on a "reliable scientific foundation." (*See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 584-587 (1993).) Specifically, my opinions and conclusions derive from a review of an entire body of evidence based upon the scientific method (the process of formulating hypotheses and then conducting experiments to prove or falsify the hypothesis). The data and evidence upon which I have relied are based upon empirical testing, the subject of extensive peer review and publication, subject to standards of protocol of operation, and are accepted by the scientific community. Accordingly, I have objectively evaluated the claims regarding RingStop as noted in the Complaint and found on the product packaging and website.

21. In connection with my thorough research and this declaration, I have reviewed numerous documents, including the marketing claims in dispute, the Complaint, and scientific journals and papers. For example, I reviewed the following:

    a. Boericke, W. Homeopathic Materia Medica (online) http://homeoint.org/books/ boerickmm/c/htm;

    b. Ernst E. Homeopathy: What does the "best" evidence tell us? *Med J Australia* 192:458-460, 2010;

    c. Goldstein, B, Shulman, A and Avitable, MJ. Clear Tinnitus®, middle-ear pressure, and tinnitus relief: a prospective trial. *International Tinnitus Journal* 13:29-39, 2007;

    d. HPUS, THE UNITED STATES HOMOEOPATHIC PHARMACOPOEIA, 1st Ed., Duncan Bros. Publishers, Chicago, 1878;

    e. Linde, K et al. Impact of study quality on outcome in placebo controlled trials of homeopathy. *Journal of Clinical Epidemiology* 52: 631-636, 1999;

    f. Linde, K et al. Systematic reviews of complementary therapies – an annotated bibliography. Part 2: Herbal medicine. *BMC Complementary and Alternative Medicine* 1:5, 2001;

    g. Moffett, JR, Arun, P and Namboodiri MAA. Laboratory research in homeopathy: Con. *Integrative Cancer Therapies* 5:333-342, 2006;

    h. Patterson, MB and Balough, BJ. Review of pharmacological therapy for tinnitus. *International Tinnitus Journal* 12:149-160, 2006;

    i. PDR for HERBAL MEDICINES, 4th Ed. Thomson Healthcare, Inc., New Jersey, 2007;

    j. Pray, WS. Homeopathy, in NONPRESCRIPTION PRODUCT THERAPEUTICS, 2nd Ed., Chapter 47. Lippincott Williams & Wilkins, 2006;

    k. Simpson, JJ, Donaldson, I, and Davies WE. Use of homeopathy in the treatment of tinnitus. *British Journal of Audiology* 32:227-233, 1998;

l. Singh, S and Ernst, E. TRICK OR TREATMENT?: THE UNDENIABLE FACTS ABOUT ALTERNATIVE MEDICINE. W W Norton and Co., London and New York, 2008.

### III. ASSIGNMENT AND MATERIALS REVIEWED

22. My project in this case was to objectively evaluate the claims of efficacy and safety for RingStop as noted in the Complaint. In connection with this project, I reviewed numerous documents, including the following:

   a. Copies of the products' labels, true and correct copies of which are attached as Exhibit C to the Declaration of Scott J. Ferrell;

   b. Copies of pages from the RingStop website: http://www.ringstop.net/ (True and correct copies of which are attached as Exhibit D to the Declaration of Scott J. Ferrell);

   c. The complaint in this action.

### IV. HOMEOPATHY

23. The product, RingStop, is advertised as "Homeopathic Medicine."

24. Homeopathic ingredients are recognized as drugs under the 1938 Federal Food, Drug, and Cosmetic Act. Homeopathic drugs are listed in the Homeopathic Pharmacopeia of the United States ("HPUS").

25. Inclusion of a homeopathic drug in the HPUS was/is determined in part by "provings." Provings involve giving homeopathic drugs to volunteers and recording the symptoms that develop as the dosage of the drugs is progressively increased. The substances that cause specific symptoms are then deemed to be able to treat illnesses that produce similar symptoms.

26. Note, however, that homeopathic "provings" in no way *prove* that a homeopathic remedy is effective (or safe to use). Most homeopathic provings were conducted decades ago and served only to identify the symptoms that were evoked by the remedies. Homeopathic "provings," then, were/are derived anecdotally, not

scientifically. Accordingly, they cannot be cited as proof of efficacy for homeopathic remedies.

27. Furthermore, homeopathic "provings" center exclusively on the belief that the symptoms of a disease reflect the body's attempts to ward off, or fight, the disease. In other words, homeopathic doctrine declares that symptoms, such as pain, nasal drainage, cough, fever, etc., are part of the body's defense against disease and should be promoted, not suppressed, rather than, as conventional medicine asserts, symptoms are an indication that disease or illness has taken hold and will disappear once the disease or illness is cured or resolves on its own.

28. Accordingly, whereas conventional medicine views the suppression or elimination of symptoms as part of the treatment process for a disease, homeopathic doctrine asserts that suppression of symptoms may actually worsen the disease. There is, to my knowledge, no evidence that this assertion is valid. Indeed, and to the contrary, the suppression of symptoms by conventional medicine does not normally interfere with the progression towards a cure of a given disease, and at the same time may ease any suffering caused by the disease.

29. Federal laws in the U.S. view homeopathic drugs differently than conventional drugs. That is, while conventional drugs (prescription and nonprescription) are subject to strict regulation by the Food and Drug Administration (FDA), homeopathic remedies are largely exempt from the intense federal scrutiny to which conventional drugs are subjected. For example, there is no requirement that homeopathic drugs be proven safe and effective at recommended doses, as there is for conventional prescription and nonprescription drugs. Moreover, manufacturers of homeopathic remedies are not required to submit New Drug Applications (NDA) to the FDA, as is the case for manufacturers of conventional drug products.

30. Homeopathy arose more than 200 years ago as the result of one physician's dissatisfaction with the manner in which medicine had been practiced for centuries prior to the late 18th Century. That physician was Samuel Hahnemann, and he

was repulsed by the extensive use of centuries-old treatments, such as bloodletting, blistering, purging, catharsis, vomiting and sweating, and the administration of often-toxic doses of herbs and metals as medicine, by his fellow physicians for the treatment of disease (we now call the heyday of those practices the era of "heroic" medicine; the term, heroic, reflects the drastic, last-ditch nature of the treatments of that time). Hahnemann viewed those procedures as both overly drastic, highly dangerous, and in the end, unhelpful. Indeed, most people in those days viewed the treatments they received from their doctors as far worse than the diseases, themselves. It is likely that many more patients probably died from the treatments they received than from their diseases.

31.  It is within this framework that Dr. Hahnemann sought a less drastic, less harmful, alternative to the conventional medical practice of his day, and homeopathy became that alternative.

32.  Homeopathy is based in part upon the so-called "law of similars," i.e., that "like cures like," or, more precisely, that one substance that causes symptoms when given in large doses will cure illnesses and diseases that elicit the same symptoms.

33.  The founder of homeopathy, Dr. Samuel Hahnemann, proposed his "law of similars" in the 1790s (*see* Singh and Ernst for a detailed history). Dr. Hahnemann had noticed after treating himself with quinine, possibly as a tonic, that he developed symptoms resembling those of malaria (at that time, quinine was a newly discovered and effective treatment for malaria). Curious, Hahnemann took doses of other medicines and concluded that they, too, had caused symptoms similar to those caused by the diseases that the medicines were intended to treat. These experiences led Dr. Hahnemann to propose his principle that "like cures like," from which he developed his "law of similars."

34.  The "law of similars" became one of the two pillars upon which homeopathy has stood ever since. Oddly, however, no credible scientific evidence has ever been presented in support of the law of similars.  In fact, scientific evidence

contradicts the law of similars, and no modern counterpart to this "law" exists in conventional medicine; indeed, quite the contrary. For example, conventional drugs that may elevate body temperature, e.g., atropine, do not necessarily fight infection. Similarly, drugs that cause intestinal cramps and diarrhea, e.g., castor oil and cascara segrada, do not cure dysentery.

35. The other pillar of homeopathy is Hahnemann's so-called "law of infinitesimals," which purports that the potency (therapeutic power) of a drug increases when that drug is rendered progressively, and exceedingly, more dilute (see below). Scientific evidence does not support the law of infinitesimals. In fact, scientific evidence contradicts the law of infinitesimals.

36. The usage of the term, "law," in reference to homeopathy should not be confused with the usage and connotation of this term in reference to conventional science. That is, a scientifically established "law" (such as the "law of gravity") reflects the repeated testing of a scientific hypothesis or theory such that the data accumulated in the testing confirms the validity of the hypothesis or theory. The "laws" of homeopathy (similars and infinitesimals) have never been validated; they were simply proposed by Dr. Hahnemann, and have remained unchanged within homeopathy ever since.

37. Homeopathic remedies are prepared through serial dilution in which the homeopathic drug (usually in the form of a "Mother Tincture," which normally would be a 10% extract of the herb or mineral from which the drug is derived) is diluted a predetermined number of times by mixing it with water or alcohol at a specific ratio of 1:10 (designated as X) or 1:100 (designated as C). Thus, for example, a homeopathic remedy designated as 3X has undergone three 10-fold dilutions and has a final concentration of 1:1,000. If designated 6X, the remedy will have undergone six 10-fold dilutions (1:1,000,000), and so on. Dilutions designated by the letter C will have undergone serial 100-fold dilutions: e.g., a 3C dilution corresponds to a final concentration of 1:1,000,000 (the same as for a 6X dilution). Every homeopathic

preparation, then, goes through successive serial dilutions until the desired dilution is reached. Droplets of the final dilution might then be placed on small tablets to produce the homeopathic remedy in solid dosage form. Alternatively, droplets of the liquid dilution can be directly administered to patients.

38. According to the Law of Infinitesimals, a 3X (1:1,000) remedy, say, is less therapeutically effective than, say, a 9X (1:1,000,000,000) remedy. This notion makes no sense in the context of classical pharmacology, where exactly the opposite is believed (and has been scientifically demonstrated); i.e., that efficacy increases with drug dosage.

39. Indeed, when a remedy has been diluted to the 24X (12C) potency, and beyond, the dilution factor has exceeded the reciprocal of Avogadro's Number. This means, simply, that the odds are exceedingly small that even one molecule of the original remedy remains in the final solution at such extreme dilutions. Science – and homeopathy – are at a loss to explain how a medicine that contains not even one molecule of the starting drug can promote a healing – indeed, any – response.

40. At each step in the serial diluting process the preparation is vigorously shaken or agitated in a standardized fashion called "succussion" (also referred to as "potentizing"). Succussion has been believed by homeopathic practitioners to activate the drug's "vital energy," which renders the drug more potent with each dilution and succussion. No evidence of this "vital energy" has ever been detected by modern science, nor can it be because there is no known biologically or physiologically detectable correlate to "vital energy." In more recent years, the concept of vital energy as the "power" behind homeopathic dilutions has been supplanted by belief that the water in which the remedy is being diluted somehow "remembers" the structure of the remedy. No convincing evidence in support of this notion has been forthcoming, although research in this area continues within the homeopathic community.

41. The concept of the "vital energy" has also been invoked to explain how homeopathic remedies work in the body; i.e., that the remedies "activate" the body's

vital energy, which then promotes the healing process. The concept of "vital energy" undergirds belief in many healing philosophies (e.g., acupuncture, Ayurvedic medicine, Chinese folk medicine, crystal healing), but as mentioned above, no evidence of the existence of such vital energy, or vital force, has ever been detected.

42. The notion that *decreasing* the concentration (or dosage) of a drug *increases* its therapeutic activity runs diametrically in opposition to the scientifically proven dose-response principle of pharmacology; i.e., that the therapeutic action of a drug increases with increasing concentrations (or doses) of the drug.

43. Moreover, the notion that extreme dilutions of drugs should be associated with observable biologic effects and actions runs contrary to the proven dose-response relationships of modern pharmacology and medicine in which the intensity of drug action is directly proportional, not inversely proportional, to dose. (In reality, the dose-response relationship is more accurately expressed in terms of the logarithm of drug dosage, for reasons that go beyond the scope of this discussion).

44. Textbooks of pharmacology discuss the dose-response relationship to one extent or another in the context of drug-receptor theory, which describes the dynamic molecular interactions through which drugs produce their effects.

45. The scientific evidence that led to the theory of drug-receptor action relies upon the dose-response relationship, and dates from the earliest studies of drug action in the late 19th Century through the present. A reading of the earliest through the latest editions (1940 through the present) of the classic textbook of pharmacology, "The Pharmacological Basis of Therapeutics," by Louis S. Goodman and Alfred Gilman provides a detailed historical record of the development of modern drug-receptor theory. The historical scientific record clearly establishes drug-receptor theory as an outgrowth of the observed relationship between drug dosage and biological response.

46. In the final analysis, there is no credible scientific evidence that homeopathy results in anything more than a placebo effect. (Ernst, 2010; Linde, 1999). Indeed, homeopathic theory and practice are contrary to what modern scientific

research in pharmacology and therapeutics has established. Homeopathy stands firmly rooted in a belief system rather than a discipline based on scientific principles. A system based on science requires empirical, objective evidence to sustain it; a belief system only requires proponents. (Moffett, Arun & Namboodiri).

## V. RINGSTOP: INGREDIENTS

47. The RingStop label lists the following 11 "active ingredients:" Calcarea carbonica 8X, 30X; Carbo vegetabilis 8X, 12X, 30X; Chininum sulphuricum 12X, 30X; Cimicifuga racemose 3X, 6X, 12X, 30X; Cinchona officinalis 3X, 6X, 30X; Coffea cruda 33X, 12X; Graphites 8X, 12X, 30X; Kali carbonicum 12X, 30X; Lycopodium 6X, 12X, 30X; Natrum salicylicum 6X; Salicylicum acidum 6X.

48. The RingStop label also lists the following 30 "Other Ingredients:" Alpha Lipoic Acid, Black Sesame (Hei Zhi Ma) (seed), Butchers Broom extract (leaf), Cassia (Gui Zhi), CoEnzyme Q10, Cyanocobalamin, Folic Acid, Garlic (bulb) (odor-controlled), Gelatin, Ginger (root), Ginkgo biloba extract (leaf), Glycerin, Inositol Hexaniacinate, Job's Tears (Yi Yi Ren) (seed), Kelp extract, L-Arginine hydrochloride, Ligusticum wallichii (Chuan Xiong) (root), Magnesium amino acid chelate, Methyl Cobalamin, N-acetylcarnitine HCl, N-acetylcysteine, Peony (Chi Shao) (root), Pueraria (Ge Gen) (root), Pyridoxine HCl, Riboflavin, Thiamine HCL, Titanium Dioxide (natural mineral capsule color), Vinpocetine, Vitamin A acetate, Zinc amino acid chelate.

49. Gelatin, glycerin, inositol and titanium dioxide may be inert components of the dosage form (i.e., the capsule and its fillers), but the other 26 ingredients seem to be included as potentially active ingredients (see below).

50. All of these ingredients are discussed below.

## VI. OPINIONS

51. Based upon the above-referenced research and analysis, as well as the practical experience summarized in my paragraphs 1 through 19 and Exhibit A, I offer the following scientific opinions regarding RingStop. My opinions are based upon

credible and well-established scientific and clinical protocols for assessing the efficacy and therapeutic claims for a medicine.

52. As I see it, three major issues underlie the case involving RingStop. They are therapeutic efficacy, promotional claims, and safety.

### A. Tinnitus

53. RingStop is promoted for the treatment of tinnitus, or ringing in the ears.

54. Tinnitus is a condition characterized by "the perception of sound within the head in the absence of external auditory stimulation" (Hazell, JWP and Jastreboff, PJ. Auditory Mechanisms: a model for tinnitus and hearing impairment. J Otolaryngology 19:1-5, 1990), and may manifest itself in a given patient as ringing, buzzing, cracking, "whooshing" sounds, etc., that may be intermittent or continuous. The severity of tinnitus ranges between barely noticeable to physically debilitating.

55. Tinnitus has many causes, including disease (e.g., Meniere's Syndrome), exposure to extremes of sound, exposure to drugs, usually in high doses, such as salicylates (e.g., aspirin), diuretics (e.g., ethacrynic acid), antibiotics (e.g., gentamicin), etc.

56. Although there has been much study of tinnitus in both animals and human subjects, there is, at present, "no compelling evidence suggesting the efficacy of any pharmacological agent in the treatment of tinnitus." (Patterson and Balough). While Patterson and Balough did not include homeopathic remedies in their review of tinnitus remedies, the current clinical evidence shows no support for the efficacy of available homeopathic remedies in treating the condition (see below).

### B. RingStop, the Product

57. The makers of RingStop have taken an interesting approach to the treatment of tinnitus. The Homeopathic Materia Medica lists numerous tinnitus remedies, each of which is claimed to be for a different type of patient (based on such factors as patient demeanor, physical appearance, personality profile, type of symptom, etc., and all of which derive from Dr. Hahnemann's "provings"). RingStop contains

eleven homeopathic remedies, some of which are present in multiple "potencies" (i.e., different dilutions), such that it could be argued that the product contains 26 different "potencies" of 11 different homeopathic remedies. The RingStop label also lists multiple "Other Ingredients" consisting of herbs, vitamins, and minerals, which, according to the RingStop website, "provide a synergistic base." These other ingredients and the notion of the "synergistic base" are discussed below.

58.  The more common names for the homeopathic ingredients in RingStop are as follows: Calcarea carbonica is calcium carbonate (chalk, limestone); Carbo vegetabilis is vegetable or activated charcoal; Chininum sulphuricum is quinine sulfate; Cimicifuga racemose is black Cohosh; cinchona officinalis is the bark of the quinine tree; Coffea cruda is unroasted coffee beans; Graphites is graphite (an allotrope – different structural form – of carbon); Kali carbonicum is potassium carbonate; Lycopodium is a genus of club mosses; and Natrum salicylicum is sodium salicylate.

59.  The Homeopathic Materia Medica lists ten of these eleven ingredients, except Coffea cruda, as useful in the treatment of tinnitus. The rationale behind these listings is not based on clinical or experimental evidence of effectiveness, but is instead based on the "provings" of Dr. Hahnemann, i.e., administration of these remedies to healthy individuals produced one or more symptoms of tinnitus. As discussed above (Para. 26), homeopathic "provings" provide no evidence that a given remedy has therapeutic efficacy; provings showed only that given remedies produced given symptoms that were then assumed to indicate that those remedies would cure the condition according to the "law of similars."

60.  The uninitiated might assume that the eleven homeopathic ingredients in RingStop work together to alleviate tinnitus, but this is not the case. According to classical homeopathic principles only one, or some, of the eleven ingredients will be effective in a given tinnitus sufferer.

61.  This notion derives from Dr. Hahnemann's view that homeopathic remedies will be effective only in patients who display certain physical and/or

NEWPORT TRIAL GROUP

- 13 -
DECLARATION OF DR. LYNN R. WILLIS

psychological characteristics. For example, the Homeopathic Materia Medica indicates that the "Calcarea [carbonica] patient is fat, fair, flabby and perspiring, and cold, damp and sour." Similarly, Materia Medica describes the "typical Carbo [vegetabilis] patient [a]s sluggish, fat and lazy and has a tendency to chronicity in his complaints." The typical Graphites patient is described as "stout, fair-complected, with a tendency to skin affections and constipation," and the typical Lycopodium patient as "intellectually keen, but weak muscled, thin, withered, full of gas, and dry."

62. The *classical* homeopathic approach to treating a condition *begins* with a lengthy one-to-one consultation between the homeopathic physician and the patient during which the physician notes as many symptoms and characteristics of the patient as possible as a means of determining which of several remedies would be appropriate for that patient. Such consultations obviously are not possible, nor intended to occur, where patients self-select homeopathic remedies off the over-the-counter shelf at the natural foods store. Accordingly, the therapeutic strategy behind including multiple homeopathic remedies in a given product, such as RingStop, apparently derives from the notion that one or another of the remedies will likely be appropriate for that patient.

63. Whereas this therapeutic strategy may make sense to homeopathic practitioners, it runs counter to an accepted ethical principle of conventional medicine; i.e., that patients should under no circumstances be given drugs for which no therapeutic benefit is anticipated. Most people who would purchase homeopathic remedies such as RingStop cannot necessarily be expected to be aware of this difference because the principles, practices and theories of homeopathy are likely unfamiliar to most consumers.

### C. The Efficacy of RingStop, The Product

64. I have found no indication in the clinical literature, conventional or homeopathic, that RingStop has been subjected to clinical investigation.

65. That is not to say, however, that there have been no studies of homeopathic remedies for tinnitus, some of which are contained in RingStop. I have found two such studies (Simpson et al. and Goldstein et al).

66. The study by Simpson et al. examined the effects on tinnitus of a homeopathic remedy (called "Tinnitus®") that contained sodium salicylate, quinine, ascaridole and conine, each at the 60X level of potency. The first two of these ingredients, sodium salicylate and quinine (natrum salicylicum and chininum sulphuricum) are also included in the RingStop formula, albeit at lesser potencies (6X and 30X, respectively).

67. The study of Goldstein et al. examined another proprietary homeopathic remedy for tinnitus, Clear Tinnitus®, which, interestingly enough, contained 7 of the 11 homeopathic ingredients contained in RingStop (Calcarea carbonica, chininum sulphuricum, cinchona officinalis, graphites, kali carbonicum, lycopodium and salicylicum acidum). Also included in Clear Tinnitus® was an assortment of herbal products entirely different from the assortment contained in RingStop.

68. Each of these studies examined both objective (investigator-derived) and subjective (self-assessment by study participants) end-points before and after treatment with either the medication or the placebo.

69. Of the two studies, the one by Simpson et al. had the most rigorous experimental design (randomized, placebo-controlled, cross-over), although the statistical power of the study was compromised by the small number of subjects (21) who completed the study. Simpson et al. inferred that the subjects, but not the investigators, were blinded as to whether they were receiving active medicine or placebo.

70. The limitations of small sample size were mitigated to a degree in this study (Simpson et al.) by the use of the cross-over experimental design. A cross-over design is one in which each subject receives both treatments, i.e., active drug and placebo. In this case, the period of placebo treatment followed the period of treatment

with the active medication. The cross-over design corrects for subjects who may be overly liberal or conservative in their self-assessment of responses to treatment (active or placebo); that is, responses by such individuals, be they positive, negative or highly variable, will, in theory, be cancelled out by the cross-over design. The success of this design, however, depends upon the maintenance of blinding; i.e., that the individual subjects in the study do not know which treatment they are receiving in each phase of the study. Simpson et al. did not discuss the degree to which the blinding may or may not have been successful.

71. In the final analysis, Simpson et al. concluded that "Tinnitus® cannot be claimed to be any more effective than placebo, on the strength of our measurements." This is to say that neither the objective nor the subjective responses to Tinnitus® could be distinguished as either statistically or clinically different from the responses to the placebo treatment.

72. The study of Goldstein et al. reported findings of a more positive nature, but because of limitations to the experimental design (no placebo treatment, no blinding, small treatment group completing the study [11 subjects]), no definitive conclusions can be drawn from the results.

73. Accordingly, there is at present no clinical evidence that supports the notion that RingStop, or any of its individual homeopathic ingredients, effectively relieves tinnitus.

74. The extent to which any of the "Other Ingredients" in RingStop might contribute to relieving tinnitus cannot be determined because the <u>quantity</u> of each of these ingredients is not provided on the product label. Neither is it evident from the wording of the label that these "Other Ingredients" are present in homeopathic dilutions or in conventional doses.

75. It has been my understanding that federal law requires that all ingredients in a remedy that is labeled "homeopathic" be present in homeopathic dilutions, and be

so designated. Hence my confusion as how to consider and evaluate these "Other Ingredients."

76. Some of the listed "Other Ingredients" in RingStop have, in fact, been utilized in conventional doses to treat tinnitus (e.g., the B-vitamins, ginkgo biloba, zinc), but none have proven sufficiently effective to warrant recommended use as reliable treatments for the condition (Patterson and Balough).

77. In any event, no assessment of possible efficacy of any of these "Other Ingredients" in RingStop can be made in the absence of information regarding how much of each ingredient is contained in each capsule.

### D. Labeling and Website Claims for RingStop

78. The RingStop label says that "RingStop helps reduce the annoyance and frustration that comes from tinnitus," that "RingStop is designed to safely help relieve tinnitus and ear noise symptoms," and "Now there's hope with RingStop!" To my knowledge, no evidence exists that confirms, or even supports, these claims.

79. The RingStop website (http://www.ringstop.net/) claims that "RingStop's unique blend of homeopathic ingredients has proven to lessen and reduce this maddening noise, and, in some cases, eliminate it." I could find no report in the literature that the effects of RingStop's unique blend on tinnitus have even been tested, let alone "proven."

80. The website also claims that "The formula also contains a unique blend of essential vitamins and minerals, phytonutrients, amino acids, and other all-natural substances that provide a synergistic base." If by the term, "synergistic base," the makers of RingStop mean that these "Other Ingredients" will enhance the effectiveness of the homeopathic medicines in the remedy, I'll ask that they supply some evidence to that effect. Otherwise, this claim is without basis and merit.

81. The website makes another claim that strikes me as especially egregious and unwarranted; to wit, that "There is no known cure for tinnitus, but now there's hope with RingStop!" On what basis do the makers of this product make this claim when, as

far as I can tell, there have been no studies that have demonstrated that RingStop even relieves the symptoms of tinnitus, let alone cures the condition.

### E. Safety Issues

82. Safety is not ordinarily a concern with homeopathic remedies owing to the very small quantities – or no quantities, where dilution is extreme – of "active" ingredients they contain.

83. If, however, the assortment of "Other Ingredients" in RingStop is present in conventional rather than homeopathic quantities, then safety very definitely becomes a factor to be reckoned with. Until the quantities of these ingredients are made known, any claims that RingStop is safe, whether made on the product label ("RingStop is designed to safely help relieve tinnitus and ear noise symptoms") or website ("RingStop is designed to safely relieve tinnitus and ear noise symptoms"), should not be permitted.

### VI. CONCLUSION

84. The available medical and scientific literature neither supports nor validates any of the claims of efficacy for RingStop.

85. In lieu of information to the contrary, the blend of vitamins, minerals, etc., that are designated as "Other Ingredients" on the RingStop label should be assumed to be present in conventional pharmacological dosages and should, accordingly, be considered potentially able to produce adverse side effects in people who use the product.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed July 2, 2012, at Indianapolis, Indiana.

Dr. Lynn R. Willis

DECLARATION OF DR. LYNN R. WILLIS

# CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2012, I electronically filed the foregoing **DECLARATION OF DR. LYNN R. WILLIS IN SUPPORT OF MOTION FOR CLASS CERTIFICATON** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

                                                                        _/s/Scott J. Ferrell_
                                                                               Scott J. Ferrell